Antonia Chion
Yuri B. Zelinsky (MD Bar #23450)
Lawrence C. Renbaum (DC Bar #450015)
Paul G. Lane (Lead Counsel) (DC Bar #428821)
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-4768 (Lead Counsel)
Facsimile: (202) 772-9227
lanep@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. C 06 6722 |
| Plaintiff, | COMPLAINT |
| v. | |
| ERIC G. BORRMANN, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## SUMMARY

1. From 1998 through 2000, McAfee, Inc., formerly known as Network Associates, Inc., (hereinafter referred to as "McAfee"), a publicly traded manufacturer and supplier of computer programs and hardware based in Santa Clara, California, carried out a multimillion dollar financial fraud. Defendant Eric G. Borrmann, who held various senior finance and investor relations positions at McAfee, provided substantial assistance to McAfee, and its executives and senior managers, in the dissemination of false and misleading information to the public about McAfee's financial condition. Borrmann also engaged in insider trading in

COMPLAINT - 1

1  violation of the federal securities laws when, during July through September 2000, he sold
2  McAfee securities while in possession of material inside information concerning McAfee's
3  deteriorating financial condition.

4      2.     Between 1998 and 2000, McAfee overstated its revenues by $622 million in order
5  to meet revenue and earnings targets. At the same time, it understated its cumulative net losses
6  by $353 million. McAfee improperly recorded hundreds of millions of dollars of revenue on
7  sales transactions with distributors in violation of the antifraud and other provisions of the
8  federal securities laws. In a fraudulent scheme to oversell its products to distributors and
9  immediately record the revenue from those transactions, McAfee secretly gave distributors
10 substantial cash payments, price discounts, rebates, and other concessions as inducements to
11 continue buying, as well as to not return, McAfee products that the distributors had no
12 reasonable expectation of selling to customers. McAfee concealed the revenue inflation fraud
13 by, among other things, falsely recording in its books and records and on its financial statements
14 certain of the payments and concessions to distributors as expenses rather than as reductions in
15 revenue and impermissibly using tax reserve accounts to offset the undisclosed payments and
16 concessions.

17     3.     Through regular meetings with McAfee's senior executives and managers during
18 1999 and 2000, Borrmann learned of these and other improper and undisclosed accounting ploys
19 that McAfee had used to publicly overstate its revenues and understate its losses. Borrmann was
20 aware also of McAfee's efforts to disguise the fraud. Rather than properly reduce revenue by the
21 cost of the distributor discounts and payments, Borrmann knew that McAfee fraudulently
22 mischaracterized these items in its books and records as "marketing expenses," which did not
23 impact reported revenues. Borrmann also knew that McAfee was improperly inflating sales
24 returns reserves accounts by drawing down unrelated tax reserve accounts in order to cover the
25 costs of the undisclosed distributor payments and discounts, and was falsely underreporting its
26 returns reserves on its financial statements.

27     4.     On July 18, 2000, McAfee issued a press release that Borrmann helped to prepare
28 and disseminate, in which McAfee announced to investors "strong financial results for the

second quarter ended June 30, 2000." Among other things, McAfee reported in the press release revenue of $233.7 million, net income of $11.4 million, and earnings of $0.08 per share. Borrmann, however, knew that the revenues and earnings reported in the press release had been materially inflated by the fraudulent schemes of the company. Nevertheless, Borrmann, as the individual responsible for McAfee's investor relations, disseminated the press release to investors without correcting the false and misleading financial information.

5. On July 20, 2000, two days after McAfee's second quarter 2000 press release and conference call with analysts, Borrmann resigned from McAfee. The next day, on July 21, 2000, Borrmann exercised options in McAfee stock and immediately sold 5,000 shares while in possession of material, nonpublic information concerning the fraud and McAfee's deteriorating financial condition. Throughout August and September 2000, Borrmann continued to exercise additional stock options and sell shares of McAfee stock based on inside information.

6. Shortly after Borrmann's stock sales, McAfee's accounting scheme began to unravel. As a result of McAfee's distribution channel stuffing, by the fourth quarter of 2000, McAfee's distributors held such huge inventories of McAfee products that they refused to buy additional product. Consequently, on December 26, 2000, after the markets had closed, McAfee announced in a press release that its sales for that quarter would be only $55 million, seventy-eight percent less than the $245 million in sales that McAfee had projected publicly only two months earlier, on October 14, 2000.

7. This news sent McAfee's stock price down sharply, slashing more than $1 billion from the company's market capitalization. After the December 26, 2000 press release, McAfee's share price dropped from its closing price of $11.75 to $4.50, the closing price on the next day. By selling his shares prior to the December 26, 2000 announcement, Borrmann made illegal profits in the amount of approximately $314,517.

8. By engaging in the acts alleged in this complaint, Borrmann violated the antifraud provisions of the federal securities laws and aided and abetted McAfee's violations of the antifraud provisions. Unless enjoined by this Court, Borrmann may violate, or aid and abet violations of, these laws in the future. The Commission requests that the Court permanently

1  enjoin Borrmann from engaging in further violations, order an accounting, order disgorgement
2  plus prejudgment interest, impose civil penalties based upon his conduct described above, and
3  bar Borrmann from acting as an officer or director of any public company.

### JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

5  9.  This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and
6  22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]
7  and Sections 21(d) and (e), 21A, and 27 of the Securities Exchange Act of 1934 ("Exchange
8  Act") [15 U.S.C. §§ 78u(d) and (e), 78u-1, and 78aa].

9  10.  Venue properly lies in this Court pursuant to Section 22 of the Securities Act [15
10 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Borrmann
11 transacted business in this judicial district, because offers and sales of the securities at issue in
12 this case took place in this judicial district, and because certain of the acts and transactions
13 constituting the violations in this case occurred within this judicial district.

14 11.  Borrmann made use of the means and instrumentalities of interstate commerce in
15 connection with the acts alleged in this complaint.

16 12.  A substantial part of the events that gave rise to the claims occurred in Santa
17 Clara County, California. However, related criminal and civil cases concerning the same or
18 substantially similar conduct as alleged herein have been filed in this Division. *United States of*
19 *America v. Terry W. Davis*, CR-03-0172-MJJ; *Securities and Exchange Commission v. Terry W.*
20 *Davis*, C-03-2729-MJJ; *United States of America v. Prabhat Goyal*, CR-04-0201-MJJ;
21 *Securities and Exchange Commission v. Prabhat K. Goyal*, C-04-2372-MJJ; *United States of*
22 *America v. Evan Collins*, CR-04-0392-MJJ; *and Securities and Exchange Commission v. Evan S.*
23 *Collins*, C-04-5030-MJJ; *Securities and Exchange Commission v. McAfee, Inc.*, C-06-009 PJH.

### THE DEFENDANT

25 13.  Borrmann joined Network General Corporation in September 1995 and worked in
26 the United Kingdom as Director of Finance, and, later, Vice President of Finance and Operations
27 for Europe, the Middle East, and Africa. In December 1997, Network General Corporation and
28 McAfee Associates, Inc. combined to form Network Associates, Inc. In about June 1999,

Borrmann returned to the United States and was assigned to investor relations for Network Associates, which is now known as McAfee, Inc. In January 2000, Borrmann became Vice President and Corporate Treasurer and was responsible for all financial planning and investor relations at McAfee. On July 20, 2000, Borrmann resigned from the company.

## THE ISSUER

14. McAfee, Inc., a Delaware corporation with its principal office in Santa Clara, California, is a manufacturer and worldwide supplier of computer programs and hardware focusing on network security, anti-virus, and network management products. McAfee's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is listed on the New York Stock Exchange under the symbol "MFE." Prior to June 30, 2004, McAfee was known as Network Associates, Inc. From 1997 through early 2002, Network Associates's shares traded on the Nasdaq National Market under the symbol "NETA." On February 12, 2002, Network Associates stock became listed on the New York Stock Exchange and began trading under the symbol "NET."

## BORRMANN WAS AWARE OF FRAUDULENT CONDUCT AT McAFEE

15. From 1998 through 2000, McAfee publicly announced its quarterly and yearly financial results in press releases to investors and in conference calls with stock market analysts. During the period from about June 1999 through July 2000, Borrmann assisted in compiling the information that was included in McAfee's press releases and earnings conference calls, including financial information. Borrmann also communicated directly with analysts by telephone or email concerning McAfee's financial performance.

16. Borrmann monitored the status of McAfee's true financial performance through the use of a document that was referred to within McAfee as the "Four-Corner Model." The Four-Corner Model was a one page document that summarized McAfee's current and projected sales figures, distributor inventory levels, reserve estimates, product returns activity, accounts receivable collections, and other important financial information. Borrmann and a closely limited number of others continually updated the Four-Corner Model. Certain information in the Four-Corner Model was used by Borrmann and others in manipulating the company's earnings

in order to meet analysts' expectations. The existence of the Four-Corner Model, however, was kept a secret among Borrmann and a few other senior McAfee executives, and those with knowledge of the Four-Corner Model understood that the document was never to be shown to McAfee's board of directors or its independent auditors.

17. In the second quarter of 1999, McAfee caused inventory levels in its distribution channel to increase dramatically as it improperly oversold its products to distributors in an effort to increase reported revenues, a practice that is known as "channel stuffing." McAfee boosted reported sales revenue by inducing distributors to buy substantially more inventory than the distributor might reasonably expect to sell to customers during a given period. Detailed sales and inventory reports received by Borrmann revealed the elevated levels of inventory in the U.S., with some quarters showing U.S. distributors holding over one year's worth of inventory in McAfee products. During the second quarter of 2000, Borrmann's last quarter with McAfee, Borrmann himself prepared a Four-Corner Model that showed McAfee's U.S. distribution channel was stuffed with approximately thirty-nine weeks, or three fiscal quarters, of unsold inventory, a material fact that Borrmann knew was not disclosed to McAfee's investors.

18. In early 2000, a McAfee senior sales manager met with Borrmann and McAfee's Controller, and presented a plan to clear out the excessive amount of inventory in McAfee's distribution channel. The plan called for McAfee to take back most or all of inventory that had been oversold to its distributors. The senior sales manager told Borrmann and the Controller that such a return would result in a "$90 million restatement" to McAfee's financial statements. The plan was never implemented.

**BORRMANN KNEW THAT McAFEE WAS MAKING EXTRAORDINARY PAYMENTS AND GRANTING DISCOUNTS AND OTHER CONCESSIONS TO DISTRIBUTORS TO REDUCE RETURNS AND INDUCE PRODUCT PURCHASES**

19. From the third quarter of 1999, until his departure from the company at the end of the second quarter of 2000, Borrmann had frequent discussions with McAfee's Controller, McAfee's CFO, and others concerning, among other things, the inflated inventory levels at McAfee's U.S. distributors, and the risk this posed to McAfee's ability to make additional sales

1  to these distributors, and, in turn, meet quarterly and yearly revenue goals. By the end of the
2  third quarter of 1999, McAfee had stuffed its U.S. inventory channel in order to achieve its
3  revenue targets, and distributors were refusing to make additional product purchases.

4      20. As a result, throughout 1999 and 2000, McAfee resorted to paying its distributors,
5  or granting large discounts and other concessions, to encourage the distributors to purchase more
6  McAfee's products or not return their overloaded inventories. During the period, McAfee made
7  extraordinary undisclosed cash payments totaling approximately $121 million to its largest U.S.
8  distributor (the "Distributor") for holding excess inventory in McAfee products, and as
9  reimbursement for the discounts and rebates. The Distributor accounted for approximately
10 twenty percent of McAfee's total revenues in each quarter during the period.

11     21. Borrmann was aware of the payments and discounts that McAfee was making to
12 the distributors by McAfee. He had regular meetings and discussions with McAfee's vice
13 president of channel sales, as well as with McAfee's CFO, Controller, and others, in which the
14 particulars of the negotiations with distributors were discussed, including, in particular, the
15 Distributor's escalating demands for discounts, payments, and other concessions. Borrmann was
16 present at meetings when McAfee's Controller and others spoke to McAfee's CFO about the
17 millions of dollars in payments to the Distributor that were necessary in order to induce the
18 Distributor to hold excess inventory, or to compensate the Distributor for the large reductions
19 that the Distributor sought on the purchase price of the products. Borrmann understood that the
20 deals with distributors were growing increasingly expensive for McAfee, and the huge payments,
21 discounts, rebates, and other concessions being granted to distributors were a risk to the
22 company's revenues each quarter.

23     22. Borrmann had regular meetings with McAfee's CFO and Controller, and others
24 during which they discussed the company's negotiation efforts with its distributors, including the
25 extraordinary efforts utilized at the end of each quarter by McAfee to get the Distributor to
26 continue to buy product, pay on outstanding accounts receivables, and to not return product.
27 Typically, near the end of each quarter, there was a shortfall between McAfee's internally
28 projected world-wide sales and its publicly announced sales and revenue expectations.

Borrmann knew that McAfee's solution was to grant payments, discounts, and other concessions to induce the Distributor to purchase enough products to fill McAfee's deficit in expected sales and thereby allow McAfee to meet or beat its expected revenue goals.

## BORRMANN WAS AWARE OF McAFEE'S ACTIONS TO DISGUISE THE FRAUD

23. From 1998 through 2000, McAfee did not properly account for the distributor payments, discounts, and concessions in conformance with Generally Accepted Accounting Principles ("GAAP"). Specifically, under GAAP, McAfee should have increased its sales returns reserves to cover the costs of the concessions, which, correspondingly, would have reduced revenues. However, such reductions to revenues would have caused McAfee to miss its quarterly revenue targets by significant amounts. To avoid this result, McAfee frequently mischaracterized the distributor payments and discounts within its books and records as something other than contra-revenue items; for example, McAfee sometimes labeled them as marketing expenses that had no impact on reported revenues. McAfee also wrongly inflated sales returns reserves to cover the cost of the undisclosed distributor payments and concessions by raiding unrelated tax reserve accounts. Borrmann was aware of each of these schemes to disguise the fraud.

### A. Borrmann Knew that McAfee was Mischaracterizing the Payments and Discounts to Distributors in Order to Fraudulently Avoid Reducing Revenues

24. Borrmann was aware of McAfee's efforts to disguise from investors the fact that McAfee was paying the Distributor enormous sums of cash. Borrmann knew of a scheme whereby certain distributor discounts were wrongly treated as marketing expenses on McAfee's books and records. Rather than properly account, under GAAP, for the cost of the distributor discounts through a reduction to revenues and a corresponding increase to a sales reserve, the payments were mischaracterized as marketing expenses and the necessary reduction in reported revenue was avoided.

25. In one instance, in November 1999, eight misleading letters were drafted to accompany $21 million in wire transfers to the Distributor purporting to explain the payments as

reimbursement for expenses such as "marketing fund rebates and other promotional programs." McAfee's Controller showed the letters to Borrmann, who suggested that the Controller make McAfee's vice president of channel sales, who was responsible for the Distributor's account, sign the letters. The sales vice president however refused to sign the letters because he knew that marketing and promotional costs for the Distributor were substantially less than $21 million for the period. To protect himself, the sales vice president prepared a memorandum to McAfee's CFO noting his concerns that the payments were evidence of "non-standard accounting practices" and "channel stuffing," and requested that the CFO sign the letters. The CFO was livid that the sales vice president had sent him the memo and told Borrmann and the Controller that this individual was "a traitor to the company [who] should be fired" for not signing the letters.

### B. Borrmann Knew that McAfee Fraudulently Manipulated its Tax Accounts in Order to Increase Inadequate Sales Reserves and Avoid Reducing Revenues

26. Another scheme employed by McAfee to inflate reported revenue was to improperly transfer amounts from tax reserve accounts to increase inadequate sales returns reserve accounts and cover the costs of the distributor discounts, payments, and other concessions. Such transfers were not in conformity with GAAP, which require sales returns reserve accounts to be increased through a reduction in revenues, not from unrelated tax reserve accounts.

27. Borrmann was present during a November 1999 meeting in which McAfee's CFO directed McAfee's Controller to make certain accounting entries that improperly transferred amounts from tax reserve accounts to increase sales return reserve accounts by $15 million. During the meeting, Borrmann specifically asked the CFO "if he [the CFO] was sure" that he wanted the Controller to make these improper transfers. Accounting for these distributor concessions in accordance with GAAP would have required McAfee to increase its reserves for returns, and, correspondingly, reduce reported revenues. Had the $15 million increase to the sales reserve account been properly accounted for as a reduction in revenue, McAfee would have missed its revenue goal in the fourth quarter 1999. Later, in the first or second quarter of 2000,

1   Borrmann learned from the Controller that the CFO had again directed the Controller to make
2   additional transfers from the company's tax reserve accounts to bolster the company's
3   inadequate sales returns reserves.

### BORRMANN ASSISTED McAFEE IN DISSEMINATING THE FALSE AND MISLEADING INFORMATION TO ANALYSTS AND INVESTORS

28. In his capacity as McAfee's Treasurer and investment relations officer, Borrmann was one of a small number of senior officials with access to nonpublic financial information about the company. Borrmann participated in compiling the information that was relayed to investors and analysts on July 18, 2000, in an earnings press release and during a subsequent conference call. This information included McAfee's reported revenues of $233.7 million, net income of $11.4 million, and earnings of $0.08 per share.

29. McAfee's statements in the press release concerning its revenues and financial condition were materially false and misleading and omitted material facts. Borrmann was aware of the fraudulent accounting schemes that McAfee utilized to inflate its revenue in the second quarter of 2000, as well as the company's efforts to disguise the fraud. Borrmann therefore knew or was reckless in not knowing that the information provided to investors in the July 18, 2000 press release and subsequent conference call concerning McAfee's revenues and earnings was false and misleading. Nevertheless, at the time McAfee publicly disseminated the press release through the media and otherwise, Borrmann emailed the press release, along with an unaudited statement of operations, to all McAfee employees worldwide.

30. After the July 18, 2000 earnings conference call, Borrmann, along with McAfee's CEO and CFO, conducted follow-up calls with analysts that were issuing research on McAfee for investors. Borrmann never informed the analysts that the revenue and earnings results reported by the company had been fraudulently inflated because McAfee's U.S. distribution channel was stuffed with over three quarters of inventory. Nor did Borrmann disclose to the analysts that McAfee had made extraordinary payments of millions of dollars to its largest Distributor and had granted deep purchase discounts to induce this and other distributors to

purchase additional McAfee product and not return the excess inventory. Further, Borrmann never revealed to the analysts that McAfee's sales returns reserves and reported revenues had been wrongly inflated through the improper use of the company's tax reserve accounts.

### McAFEE'S FRAUD CAUSED SUBSTANTIAL LOSSES TO INVESTORS

31.    McAfee's accounting scheme unraveled in the fourth quarter of 2000 when, after eleven quarters of stuffing products into the distribution channel, McAfee's distributors held such large inventories of McAfee's products that were less willing to purchase into inventory additional products. Consequently, on December 26, 2000, McAfee announced in a press release that its sales for that quarter would be only $55 million, dramatically less than the $245 million in sales that McAfee had projected publicly on October 14, 2000. Also on December 26, McAfee announced without explanation the departures of its chief executive officer, chief financial officer, and its president. The news sent McAfee's stock price down sharply and slashed more than $1 billion from the company's market capitalization. On December 26, 2000, prior to the issuance of the press release, McAfee's stock price had closed at $11.75. After the press release, in after hours trading, McAfee's share price dropped sixty-six percent to open on December 27, 2000, at $3.97. On December 27, 2000, McAfee's share price reached a low of $3.25, and closed at $4.50.

32.    On October 31, 2003, McAfee restated its financial results to correct, among other things, the fraudulent channel stuffing that wrongly inflated McAfee's revenue and earnings during 1998 through 2000. The company recalculated all revenue previously recognized at the time of sale to a distributor during the period to reflect a postponement of the revenue recognition until the time the distributor actually sold the products. As result of the October 2003 restatement, and a prior partial restatement made in June 2002, McAfee's cumulative net revenues for the period 1998 through 2000 decreased by $622 million and cumulative net losses increased by $353 million from what had been previously publicly reported.

33.    Focusing on the second quarter of 2000 alone, the period during which Borrmann assisted in compiling the financial information that was relayed to investors and analysts in McAfee's July 18, 2000 earnings press release and subsequent conference calls, the effect of

October 2003 restatement on McAfee's financial statements was dramatic. Revenues of $233.7 million as reported to investors by McAfee and Borrmann were reduced to $158.6 million, a forty-seven percent overstatement. Similarly, reported net income of $11.4 million was restated as a net loss of $101.3 million, or a decrease of nine hundred and eighty-nine percent.

### BORRMANN SOLD STOCK WHILE IN POSSESSION OF MATERIAL, NONPUBLIC INFORMATION CONCERNING THE FRAUD

34. On July 21, 2000, the day after he resigned from McAfee, Borrmann exercised stock options on 5,000 shares of McAfee stock at $11.06 a share and immediately sold the shares in the market for $21.44 a share, for net proceeds of $10.38 a share. On August 7, 2000, Borrmann exercised additional stock options on 5,000 shares of McAfee stock at $11.06 a share and immediately sold the shares in the market for $20.44 a share, for net proceeds of $9.38 a share. Also on August 7, 2000, Borrmann sold for $20.50 an additional 1,389 McAfee shares that he had purchased through an employee stock purchase plan, avoiding losses totaling $17,816. On August 29, 2000, Borrmann again exercised stock options on 5,000 shares of McAfee stock at $11.06 a share and immediately sold the shares in the market for $24.56 a share, for net proceeds of $13.50 a share. On September 20, 2000, he exercised stock options on 12,648 shares of McAfee stock at $11.06 a share and immediately sold the shares in the market for $21.37 a share, for net proceeds of $10.31 a share. In total, Borrmann made illegal profits of $314,517 by selling McAfee securities while in possession of material, nonpublic information about McAfee that he obtained in his capacity as Treasurer and investor relations officer of McAfee.

### FIRST CLAIM
**Borrmann Aided and Abetted McAfee's Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5**
**[Financial Fraud]**

35. Paragraphs 1 through 34 are realleged and incorporated herein by reference.

36. Borrmann knowingly and substantially participated and assisted McAfee, in connection with the offer, purchase, or sale of securities, with McAfee's scheme to knowingly or recklessly make material misrepresentations and omissions of fact concerning its financial

condition and operating 15results for the period from 1999 through 2000 in financial statements, periodic reports, and press releases.

37. By reason of the foregoing, Borrmann aided and abetted McAfee's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM
### Borrmann Violated Securities Act Section 17(a), Exchange Act Section 10(b) and Exchange Act Rule 10b-5
### [Insider Trading]

38. Paragraphs 1 through 37 are realleged and incorporated herein by reference.

39. Borrmann sold McAfee stock while in possession of material nonpublic information concerning McAfee's true financial condition, in breach of his fiduciary duties to McAfee and its shareholders.

40. By reason of the foregoing, Borrmann violated Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## RELIEF REQUESTED

WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that this Court:

I.

Issue an order of permanent injunction restraining and enjoining Borrmann, and his agents, servants, employees, attorneys, and assigns, and those persons in active concert or participation with him, and each of them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Sections 10(b) [15 U.S.C. §§ 78j(b)], and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5].

II.

Order an accounting by Borrmann of all money, property, and other assets directly or indirectly derived from the conduct alleged herein.

### III.

Issue an order directing Borrmann to disgorge, with prejudgment interest, all ill-gotten gains resulting from his conduct alleged herein.

### IV.

Issue an order directing Borrmann to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1].

### V.

Enter an order under Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Borrmann from acting as an officer or a director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### VI.

Grant such other and further relief as this Court may deem just and proper.

Dated: OCTOBER 24, 2006

*Paul G. Lane*
Paul G. Lane (Lead Counsel)
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551-4768 (Lead Counsel)
Facsimile:  (202) 772-9227

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

## I.(a) PLAINTIFFS
United States Securities and Exchange Commission

## DEFENDANTS
Eric G. Borrmann

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.
Alameda County

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Paul G. Lane, Esq.  U.S. Securities and Exchange Commission
100 F Street, N.E., Washington, DC, 20549-7553  (202) 551-4768

ATTORNEYS (IF KNOWN)
Anthony Pacheco, Esq.  Proskauer Rose, LLP  (310) 284-5647
2049 Century Park East, #3200, Los Angeles, CA, 90067-3206

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)
- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [ ] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For diversity cases only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)
- [X] Original Proceeding
- [ ] Removed from State Court
- [ ] Remanded from Appellate Court
- [ ] Reinstated or Reopened
- [ ] Transferred from Another district (specify)
- [ ] Multidistrict Litigation
- [ ] Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐610 Agriculture | ☐422 Appeal 28 USC 158 | ☐400 State Reapportionment |
| ☐120 Marine | ☐310 Airplane | ☐362 Personal Injury Med Malpractice | ☐620 Other Food & Drug | ☐423 Withdrawal 28 USC 157 | ☐410 Antitrust |
| ☐130 Miller Act | ☐315 Airplane Product Liability | ☐365 Personal Injury Product Liability | ☐625 Drug Related Seizure of Property 21 USC 881 | | ☐430 Banks and Banking |
| ☐140 Negotiable Instrument | ☐320 Assault Libel & Slander | ☐368 Asbestos Personal Injury Product Liability | ☐630 Liquor Laws | PROPERTY RIGHTS | ☐450 Commerce/ICC Rates/etc. |
| ☐150 Recovery of Overpayment & Enforcement of Judgment | ☐330 Federal Employers Liability | | ☐640 RR & Truck | ☐820 Copyrights | ☐460 Deportation |
| ☐151 Medicare Act | ☐340 Marine | PERSONAL PROPERTY | ☐650 Airline Regs | ☐830 Patent | ☐470 Racketeer Influenced and Corrupt Organizations |
| ☐152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐345 Marine Product Liability | ☐370 Other Fraud | ☐660 Occupational Safety/Health | ☐840 Trademark | ☐810 Selective Service |
| ☐153 Recovery of Overpayment of Veteran's Benefits | ☐350 Motor Vehicle | ☐371 Truth In Lending | ☐690 Other | | [X]850 Securities/Commodities/Exchange |
| ☐160 Stockholders Suits | ☐355 Motor Vehicle Product Liability | ☐380 Other Personal Property Damage | LABOR | SOCIAL SECURITY | ☐875 Customer Challenge 12 USC 3410 |
| ☐190 Other Contract | ☐360 Other Personal Injury | ☐385 Property Damage Product Liability | ☐710 Fair Labor Standards Act | ☐861 HIA (1395ff) | ☐891 Agricultural Acts |
| ☐195 Contract Product Liability | | | ☐720 Labor/Mgmt Relations | ☐862 Black Lung (923) | ☐892 Economic Stabilization Act |
| ☐196 Franchise | | | ☐730 Labor/Mgmt Reporting & Disclosure Act | ☐863 DIWC/DIWW (405(g)) | ☐893 Environmental Matters |
| | | | ☐740 Railway Labor Act | ☐864 SSID Title XVI | ☐894 Energy Allocation Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐790 Other Labor Litigation | ☐865 RSI (405(g)) | ☐895 Freedom of Information Act |
| ☐210 Land Condemnation | ☐441 Voting | ☐510 Motion to Vacate Sentence Habeas Corpus: | ☐791 Empl.Ret. Inc. Security Act | FEDERAL TAX SUITS | ☐900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐220 Foreclosure | ☐442 Employment | ☐530 General | | ☐870 Taxes (US Plaintiff or Defendant) | ☐950 Constitutionality of State Statutes |
| ☐230 Rent Lease & Ejectment | ☐443 Housing | ☐535 Death Penalty | | ☐871 IRS - Third Party 26 USC 7609 | ☐890 Other Statutory Actions |
| ☐240 Torts to Land | ☐444 Welfare | ☐540 Mandamus & Other | | | |
| ☐245 Tort Product Liability | ☐440 Other Civil Rights | ☐550 Civil Rights | | | |
| ☐290 All Other Real Property | ☐445 Amer w/ disab - Empl | ☐555 Prison Condition | | | |
| | ☐446 Amer w/ disab - Other | | | | |
| | ☐480 Consumer Credit | | | | |
| | ☐490 Cable/Satellite TV | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
15 U.S.C. Sec. 78j(b), 15 U.S.C. Sec. 77q(a), 17 C.F.R. Sec. 240.10b-5:  Financial fraud and insider trading

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $_____     ☐ CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES  [X] NO

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)     [X] SAN FRANCISCO/OAKLAND     ☐ SAN JOSE

DATE  10/24/06

SIGNATURE OF ATTORNEY OF RECORD
Paul G. Lane

COPY